Per Curiam.
The plaintiff filed her bill in equity to set aside an award appraising the fee value of the certain lot of land known as “No. 253 West Forty-Fourth Street,’’ this city, and the building thereon,—the lot at $12,000, and the building at $9,500. The defendant owned the lot By indenture dated July 10, 1872, it was leased by his predecessor in title, John J. Astor, to James Henderson and James Blackhurst, for the term of twenty yearn and six months, commencing November 1,1871, and ending May 1, 1892. The plaintiff, prior to January 1, 1892, succeeded to all the title of the lessees.
The lease contained the following provision :
*115 “And the said parties, for themselves and their legal representatives, mutually covenant and agree that provided the said parties of the second part and théir legal representatives shall observe, keep, and perform all the covenants and agreements herein contained on their part to be kept and performed, and if there shall be standing on the said demised premises at the expiration of the original term of this lease the building which the said parties of the second part have erected on the demised premises under a lease heretofore granted to them, viz., a dwelling-house, not less than three stories in height above the basement, with front of brown stone, yellow stone, or Philadelphia brick, covering the whole front of the lot, or any building of similar description in its place in case of its destruction, then, and in such case, each of the said parties, or their legal representatives, during the thirty days immediately preceding three months before the expiration of the term hereby granted, shall choose one disinterested reputable freeholder in the city of New York, and the two thus chosen shall select a third person, also being a freeholder in said city; and the persons thus chosen and selected, first being duly sworn or affirmed for such purpose, shall value and appraise the fee-simple value of the said lot of land, exclusive of the house standing thereon, and shall also value and appraise the house standing on the front of said lot, which said valuation and appraisal made by the said appraisers, or any two of them, shall be reduced to writing, and signed by them, or any two of them, in duplicate, and one part thereof delivered to each of the said parties, or their legal representatives, within thirty .days after the appointment of the said appraisers. And the said party of the first part covenants, for himself and his legal representatives, that, in case he or they do not elect within thirty days after the receipt of such appraisal to pay for the said building at such appraised value, he or they will grant a renewal of the said lease for a further term of twenty years at an annual rental equal to five per cent, upon the said appraised value of the said lot, to be paid quarterly; and, further, that, in case he or they elect to take the said building at the said valuation, he or they shall pay to the said parties of the second part, or their legal representatives, the amount of such valuation at the expiration of the term hereby granted, provided the said building shall then be in the same good order and condition as when valued as aforesaid.” About three months before the expiration of the first term of the lease, the defendant chose George R. Read, and the plaintiff chose James A. Lynch, as appraisers, under the above provisions, and on March 14, 1892, these two selected Thomas C. Acton as umpire or third appraiser. At a meeting held March 17, 1892, upon hearing the parties, and after discussion among the three appraisers, a majority agreed upon a valuation, to wit, $12,000 for the lot, and $9,500 for the house standing thereon; but Appraiser Lynch, who had been chosen by the tenant, refused to act further in the appraisal. Thereafter the remaining appraisers, Messrs. Acton and Read, signed as of March 17th, a formal appraisal of the premises in question at the value agreed upon, which was delivered to the plaintiff on March 21, 1892. On the *116 same day the defendant notified the plaintiff of his election to renew the lease pursuant to the appraisal. The plaintiff refused to accept the appraisal, and brought this suit, upon, substantially, the following grounds: (1) That Appraiser Read was not a disinterested freeholder; (2) that Appraiser Acton was improperly selected ; (3) that the formal appraisal before its delivery, on the 21st of March, ought to have been submitted to Appraiser lynch for his signature, and was irregular and invalid, because not so submitted; (4) that certain briefs which some of the tenants claimed had been submitted to the appraisers were not read; (5) that Appraiser Read stated to his fellow appraisers some facts regarding rental values of real estate in the neighbood which had not been stated while the 'tenants were present; (6) that the value of the building upon the lot in question was not, in fact, passed upon; (7) that the appraisement was grossly excessive as to the lot, and grossly inadequate as to the building.
The issues were referred to Stephen P. Nash, Esq., who filed the following opinion:
“I think-the plaintiff has failed to make out a case for setting aside the award, by reason of the alleged unfitness of the appraiser nominated by the landlord, or of the mode in which the third appraiser was selected. Mr. Read’s business relations with the landlord were not such as to disqualify him as an appraiser, nor were there any representations whatever made to the tenants -or their appraiser in respect to him. He was not incompetent, I think, within the case of Bradshaw v. Agri. Insurance Co., 137 N. Y. 137; 50 St. Rep. 174. Nor was the mode adopted for securing the third appraiser objectionable. I do not find the slightest evidence that Mr. Baker, who declined to act himself, but furnished two lists of names for the consideration of the two appraisers, did so with any sinister intent. The names on these lists were of men prominent in financial circles. Mr. Lynch might have objected to them on that ground, but he exercised his own judgment independently, and that the choice fell upon Mr. Acton was clearly not due to any trick or device.
“ I have also come to the conclusion that there was no such irregularity in the proceedings of the appraisers as vitiates their appraisement. They heard the tenants at length. None of the tenants asked for an adjournment. No one proposed to give evidence as to values, and that the appraisers made their valuation without evidence is no ground for impeaching their conclusion. Cobb v. Dolphin Manuf. Co., 108 N. Y. 463; 13 St. Rep. 697. They were assumed to be competent judges of the value of lands in the vicinity, and that they did not take several days in determining such value can hardly be ground for impeaching their conclusions.
“ But it is claimed that, having agreed on a basis of valuation before separating, the two appraisers who so agreed should have given Mr. Lynch, who dissented, another opportunity for acting with them by submitting to him the appraisements drawn up in accordance with such valuation. The two appraisers testify that he absolutely refused to agree to that basis. I think he substantially admits this.
*117 “ It is argued that the memoranda made during the session ■ of the appraisers, as to the value of a full lot, was an award which could not be completed afterwards. I think this view is erroneous. Two appraisers agreed upon a basis of valuation to be applied to the several lots and houses by computation. What remained to be done was a simple apportionment. They had the form of an award furnished them, with blanks. They filled up the blanks, and signed the completed instruments. I cannot see that this impairs the validity of the award. Maynard v. Frederick, 7 Cush. 247; Blodgett v. Prince., 109 Mass. 44. No irregularity, it must be conceded, occurred during the hearing of the tenants. After this the appraisers remained in consultation. What is complained of is what occurred during this consultation, during the animated discussion of at least an hour, testified, to only by the arbitrators themselves, the attacloon the conduct of two of them being made by the other. There were no notes kept of these discussions, and no one but the appraisers was present. I doubt whether much reliance should be placed on testimony of this character. In some tribunals I think it would be incompetent. See Duke of Buccleuth v. Board of Works. L. R., 5 H. L. 418. One can hardly imagine the discussions of judges in consultation being made the ground of annulling their adjudication upon the testimony of a dissenting judge; and the evidence of jurors to impeach their own verdict is received with very strict limitations. Thomas v Chapman, 45 Barb. 98. Declarations of admissions of jurors or arbitrators are open to still graver objections. Clum v. Smith, 5 Hill, 560; In re Whiteley (1891) 1 Ch. Div. 558. I have, however, examined the testimony of the appraisers with care. Mr. Lynch went into the arbitration, with the idea that the restrictions in the lease ought necessarily to lead to a low rental ; and he seemed to desire to discuss the various aspects of the case in that view. The view of the other arbitrators seems to have been that what they had to do was to value the land, not to fix the rental; and they concur in testifying that they gave effect to the restrictions as impairing such value to the extent of about twenty per cent., placing the values of a full lot of twenty-five feet front at §20,000, unrestricted, at $16,000 restricted. Mr. Lynch testifies that he said to his associates that he did not think there could be much difference between them as to the value of a full lot free and unincumbered. The discussion, however, as he stated it, and as it is presented in the argument of the tenants, of which the brief of one of them (Mr. Smith) may be considered as an abstract, discloses that the claim on the part of the tenants was substantially that the appraisers should fix a reasonable ground rent, or at least put such a valuation on the land as would give a reasonable rent. Mr. Action said: 1 What we have to do is to appraise the value of the land.’ And several expressions imputed to him indicated that, the hardship of the terms of the lease being urged, his response was that, as to that, they must go to the landlord; that the appraisers could not change the. terms of the lease, etc. Now, here is undoubtedly the' difficulty of the situation if the award leads to a rental that is too high. A lot may well be worth $12,000 as a vacant lot, and *118 yet five per cent, on that value, the tenant paying taxes and assessments, be, in view of the present rates of interest, a high rent. A landlord might be willing to recognize this fact in negotiating for a renewal, and still, if an appraisement is unavoidable, the terms of the lease must govern. Some of the language said to have been used in the discussion with the tenants, indicates, I think, that this was what was in mind. Mr. Lynch kept urging that Mr. Action should consult the case of Livingston v. Sage, or have some lawyer advise him as to its bearing ; and Mr. Action could not see how any such case as Mr. Lynch described it could affect the value of the lots.
“ Though it does not seem to be very fair to any appraisement to have the discussion between the appraisers, whether brought out by their own examination or by the attack of one of them upon the positions of the others, used to impeach it, I have tried to get at the substantial difference of view, and think I have drawn the correct conclusion, that the majority of the appraisers assumed that their duty in respect to the lot was simply to value it as a piece of land, affected as to the mode of enjoyment by the restrictions in the lease. It is said that Mr. Read used a memorandum as to rentals in the neighborhood, and that he had placed them too high. 1 An appraiser would, of'course, not overlook the rentals in forming his judgment, but they were not so conclusive a«factor as to make it- necessary to ascertain the rentals of each house, whicli might easily vary according to condition of repair, the periods when rented, etc. The house in this case was occupied by its owner.
“ The objection that Mr. Action promised to read the briefs handed in, and that he did not do so, might, under such circumstances, have a bearing on the propriety of his conduct. But, so far as appears, the briefs contained nothing that had not been stated orally. Mr. Action is confused in his testimony as to what he did about the briefs, whether he read them or not.' But what he is reported to have said in respect to having read them ought not to be considered competent evidence against the award.
“ The testimony given to enable me to fix a rental in case the appraisement should be vacated is as discordant as such testimony generally is; and, if I undertook to act upon it, I should be met at once with the question which I think divided the arbitrators : Gan I depart from the terms of the lease and fix any other rental than five'per cent, on the value of the lot, even though I might think that such a rent would be a higher one than the property can afford to pay? I think not. I think the terms of the lease, though possibly onerous, are binding upon the parties. In this view, I do not think that the testimony as to the value of the land would justify me in a conclusion that the appraisement as to such value was excessive. Much of the testimony is largely speculative and quite irrelevant, if the question is only as to the fair value of the lot. But, as I feel it my duty to sustain the award-, I mate no finding in respect to what is the value of the lot; or what should be a. proper rental.”
The statement mad'e by Appraiser Read to his fellow appraisers *119 was not improper, being a mere narrative of his experience. The value of the building was clearly passed upon, and there is nothing in the evidence which warrants the claim that its valuation was inadequate, or that the sum fixed for the lot was excessive. The findings are fully sustained by the proofs, and there is no error which calls for a new trial. The referee properly refused to pass upon the plaintiff’s requests to find. They were submitted under section 1023 of the Code, which was repealed by chapter 688 of the Laws of 1894, and the latter act went into effect June 1, 1894. The requests having been made June 18, 1894, came too late. Lazarus v. Met. E. Railway Co., 65 St. Rep. 523.
For these reasons and those stated by the learned referee, whose opinion is adopted, the judgment appealed from must be affirmed, with costs.